UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND, as Receiver for
EquiAlt LLC, EquiAlt Fund, LLC,
EquiAlt Fund II, LLC, EquiAlt Fund
III, EA SIP, LLC,

          Plaintiff,

v.                                              Case No:   8:21-cv-360-JLB-CPT

ERIK ADAMEK, et al.,

          Defendants.

_____

## <u>ORDER</u>

This is a "clawback" action brought by Plaintiff Burton W. Wiand (the "Receiver") to recover false profits transferred to each Defendant by the perpetrators of a Ponzi scheme.  (*See* Doc. 1).  Before the Court is the Receiver's Motion for Summary Judgment.  (Doc. 416).  Defendant Silvana Briguglio responded (*see* Doc. 423), however, Ms. Briguglio has since been terminated from this case.  (*See* Doc. 429; Doc. 441).  Defendants Helen and Hamlet Adamian, David Blitz, Blake Mahler, Dawn and Scott Stallmo, James and Ann Bartusek, and Sudhaker and Jyotihka Patel also responded.  (*See* Doc. 424).  But Mr. and Ms. Adamian, Mr. Mahler, and Mr. and Ms. Bartusek have also since been terminated. (*See* Doc. 436; Doc. 430; Doc. 432).  Finally, while he did not respond to Plaintiff's motion, Defendant Lawrence Tiede was terminated from this case.  (*See* Doc. 443). Accordingly, the only Defendants to whom the Receiver's Motion for Summary

Judgment applies are Mr. Blitz, Mr. and Ms. Stallmo, and Mr. and Ms. Patel.  After carefully reviewing the filings, the Court determines that Plaintiff's Motion for Summary Judgment is **GRANTED**.

## <u>UNDERLYING FACTS</u>

On February 11, 2020, the Securities and Exchange Commission ("SEC") filed a complaint against Brian Davison, Barry Rybicki, EquiAlt LLC, EquiAlt Fund, LLC ("Fund I"), EquiAlt Fund II, LLC ("Fund II"), EquiAlt Fund III, LLC ("Fund III"), and EA SIP, LLC ("EA SIP"), (together the "corporate defendants") as well as various "relief defendants."  *See S.E.C. v. Brian Davison, et al.*, Case No. 8:20-cv-325-MSS-MRM, Doc. 1 (M.D. Fla. Feb. 11, 2020).  The SEC alleged that Mr. Davison and Mr. Rybicki (the "Insiders"), created a Ponzi scheme and violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c); Section 17(a) of the Securities Act, 15 U.S.C. §§ 77(q)(A); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(j)(b); Exchange Act Rule 10b-5, 17 C.F.R. § 240.10B-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a).  *See id.* The SEC sought a temporary restraining order, preliminary injunctive relief, a permanent injunction, an asset freeze, appointment of a receiver, records preservation, a sworn accounting, disgorgement, prejudgment interest, and civil penalties.  *See id.*

On February 14, 2020, the *Davison* court appointed Burton Wiand as the Receiver for both the corporate defendants and the relief defendants.  *Id.* at Doc. 11. Pursuant to the *Davison* court's order appointing a Receiver, the Receiver was

"directed to: . . . . [i]nvestigate the manner in which the affairs of the Corporate Defendants and Relief Defendants were conducted and institute such actions . . . includ[ing] . . . seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers . . . ." *Id.* at Doc. 11 at ¶ 2. The Receiver also took "possession of all of the assets of the Corporate and Relief Defendants in the SEC action." (Doc. 416-2 at ¶ 6). At the time of the Receiver's appointment, the Funds owed an outstanding debenture principal of $169,292,866, including both expired and unexpired debentures. (Doc. 416-1 at ¶ 44).

On August 17, 2020, the *Davison* court determined that "the evidence shows that the Defendants most likely operated as a Ponzi scheme using new investor funds to pay old investor obligations while simultaneously siphoning funds for their own benefit far and above any amount that anyone might reasonably believe was disclosed to investors." *See S.E.C. v. Brian Davison, et al.*, Case No. 8:20-cv-325-MSS-MRM, Doc. 184 at 2. Further, the *Davison* court found that the SEC "ha[d] demonstrated a substantial likelihood of proving that it w[ould] prevail on its Section 5 and Section 10(b) registration claims based on the affirmative evidence developed to date demonstrating fraud, the sale of unregistered securities, and representations to investors that were materially false." *Id.* at 3.

The Receiver testified that Mr. Davison and Mr. Rybicki (the "Insiders") operated the EquiAlt Entities as a Ponzi scheme between September 2011 and December 2019. (Doc. 416-2 at ¶¶ 10, 12). The Insiders sold debentures through Fund I, Fund II, Fund III, and EA SIP ("the Funds") and REIT shares to investors

for the purchase of real properties by the Funds and the REIT. (*Id.* at ¶ 10). Specifically, from September 2011 through December 2019, the EquiAlt Entities sold debentures to investors in Fund I. (*See* Doc. 416-1 at ¶ 28). From May 2013 through December 2019, the EquiAlt Entities sold debentures to investors in Fund II. (*Id.* at ¶ 29). From July 2013 through December 2015, the EquiAlt Entities sold debentures to investors in Fund III. (*Id.* at ¶ 30). And from April 2016 through December 2019, the EquiAlt Entities sold debentures to investors in EA SIP. (*Id.* at ¶ 31). In total, the Insiders raised approximately $178,000,000 in transactions with more than 1100 investors. (Doc. 416-2 at ¶ 12). The investors were supposed to receive a return between eight and twelve percent on their debenture investments. (Doc. 416-1 at ¶ 24; *see, e.g.*, Doc. 424 at 15). During this period, each of the Funds operated by the Insiders had revenues that were insufficient to meet their monthly obligations to investors. (Doc. 416-1 at ¶¶ 28–31).

On February 13, 2021, the Receiver filed this clawback action to recoup the monies transferred or paid to the investor Defendants, which were improperly diverted assets of one or more of the EquiAlt Entities. (Doc. 1 at ¶ 197). As the Receiver alleged:

> All money the Insiders wrongfully caused the EquiAlt Entities to transfer or pay to the Defendants was diverted and misappropriated by the Insiders in furtherance of the scheme. . . . These payments to investors were a necessary and important part of the Insiders' scheme and allowed them to create the façade that EquiAlt was a bona fide investment business.

*Id.*

It is uncontested here that the remaining Defendants all invested in, and received false profits as a result of, the Ponzi scheme.[1]  (Doc. 416-1 at ¶¶ 65–71). Such false profits, the associated prejudgment interest, and the total amount owed by each Defendant are as follows:

- David Blitz received $28,583 in false profits.  (*Id.* at ¶ 69).  The calculated prejudgment interest based on Mr. Blitz's false profits is $6,217 for a total amount of $34,800.  (*Id.*)

- Dawn Stallmo received $85,208 in false profits.  (*Id.* at ¶¶ 65–66).  The calculated prejudgment interest based on Ms. Stallmo's false profits is $16,985 for a total amount of $102,193.  (*Id.*)

- Scott Stallmo received $21,583 in false profits.  (*Id.* at ¶¶ 67–68).  The calculated prejudgment interest based on Mr. Stallmo's false profits is $3,106 for a total amount of $24,689.  (*Id.*)

- Sudhaker and Jyotihka Patel received $27,750 in false profits.  (*Id.* at ¶ 71).  The calculated prejudgment interest based on Mr. and Ms. Patel's false profits is $4,852 for a total amount of $32,602.  (*Id.*)

---

[1] The Receiver filed his Motion for Summary Judgment against twelve of the remaining Defendants in this case: Helen and Hamlet Adamian, James and Ann Bartusek, Blake Mahler, Dawn and Scott Stallmo, David Blitz, Silvana Briguglio, Sudhaker and Jotihka Patel, and Lawrence Tiede.  (*See* Doc. 416 at ¶¶ 6–15).  As the Court noted above, however, since the Receiver filed his Motion for Summary Judgment, Ms. Briguglio, Mr. and Ms. Adamian, Mr. Mahler, and Mr. and Ms. Bartusek have been terminated from this case.  (*See* Doc. 429; Doc. 441; Doc. 436; Doc. 430; Doc. 432; Doc. 443).  Furthermore, Mr. Tiede has been terminated from this case.  (Doc. 443).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

In order to defeat a Motion for Summary Judgment, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court will not weigh the evidence presented by the parties, however. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).  Instead, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Anderson*, 477 U.S. at 249.

## Discussion

In his Complaint, Receiver brings two claims against the Defendants: (1) an action to claw back distributed false profits under the actual fraud and constructive fraud provisions of the Florida Uniform Fraudulent Transfer Act (Count I), and (2) an action to claw back distributed false profits under the common law theory of unjust enrichment (Count II). (Doc. 1 at ¶¶ 198–213). Defendants have asserted four affirmative defenses. (*See* Doc. 355 at ¶¶ 11–14; Doc. 418 at ¶¶ 11–14).

The Receiver now moves for summary judgment as to both counts of the Complaint. (Doc. 416 at 9–15). Count I asserts that the Insiders' transfers to Defendants were fraudulent under Florida's Uniform Fraudulent Transfer Act ("FUFTA"), and requests that the Court enter judgment against each Defendant avoiding the transfers in the amount of each Defendant's false profits, together with interests and costs. (Doc. 1 at ¶¶ 198–206). Count II is a claim for unjust enrichment, asserted in the alternative in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law. (*Id.* at ¶ 208). The Receiver also moves for summary judgment as to Defendants' four affirmative defenses. (*See* Doc. 416 at 15–23).

### A. Summary judgment is granted in favor of the Receiver as to Count I of his Complaint, which asserts actual and constructive fraud under sections 726.105(1)(a) and (b) and 726.106(1) of FUFTA.

First, the Receiver seeks summary judgment on his claims of actual and constructive fraud under sections 726.105(1)(a) and (b) and 726.106(1) of FUFTA. "FUFTA provides a statutory scheme by which creditors may set aside a debtor's

7

transfer of asset[s] to third parties under certain circumstances." *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1318 (M.D. Fla. Mar. 19, 2009).

### 1. Summary judgment is granted in favor of the Receiver as to his actual fraud claims.

Under FUFTA's actual fraud provision:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Fla. Stat. § 726.105(1)(a) (2022). The Eleventh Circuit has explained that FUFTA requires that: "(1) there was a creditor to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property which could have been applicable to the payment of the debt due." *Wiand v. Lee*, 753 F.3d 1194, 1203 (11th Cir. 2014) (quoting *Nationsbank, N.A. v. Coastal Utils., Inc.*, 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002)).

A "creditor" is a "person who has a claim," Fla. Stat. § 726.102(5), and a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," *id.* § 726.102(4). The fraudulent transfer must be of an "asset," which is defined as any "property of a debtor," excluding certain narrow exceptions. *Id.* § 726.102(2). If FUFTA's conditions are satisfied, "a creditor, subject to [certain] limitations[,] may obtain . . .

8

[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 726.108.

Here, the Receiver is the creditor, the Insiders are the debtors, and Defendants are the third-party transferees from whom the Receiver seeks to recover. *See Waxenberg*, 611 F. Supp. 2d at 1318; *see also Lee*, 753 F.3d at 1203 (explaining, "the receivership entities became 'creditors' of [the insider] at the time he made the transfers of profits to [defendant] and others because, as FUFTA requires, they had a claim against [the insider]"). Thus, the Receiver's claim fits within the first and second elements of the test of actual fraud under FUFTA as there was a creditor to be defrauded and a debtor intending fraud. *See Lee*, 753 F.3d at 1201 ("Under FUFTA's actual fraud provision, proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a)."); *S.E.C. v. Brian Davison, et al.*, Case No. 8:20-cv-325-MSS-MRM, Doc. 184 at 2 (M.D. Fla. Aug. 17, 2020) (holding that "the evidence shows that the Defendants most likely operated as a Ponzi scheme using new investor funds to pay old investor obligations while simultaneously siphoning funds for their own benefit far and above any amount that anyone might reasonably believe was disclosed to investors").

Thus, the Court turns to the third element of a claim of actual fraud under FUFTA: "(3) a conveyance of property which could have been applicable to the payment of the debt due." *Lee*, 753 F.3d at 1203. The undisputed record evidence reflects that each of the Defendants received various conveyances from the entities

now in receivership after making their initial investments and during times at which the Ponzi scheme was running.  For example, Ms. Stallmo received dozens of transfers totaling $74,999.88 in Net Winnings on a $250,000 debenture between November 2016 and December 2019.  (*See* Doc. 416-1 at 95–96).  Mr. Stallmo received dozens of transfers totaling $16,650 in Net Winnings on a $54,000 debenture between January 2017 and February 2020.  (*Id.* at 103–04).  Mr. Blitz received dozens of transfers totaling $28,583.22 in Net Winnings on a $100,000 debenture between December 2015 and December 2018.  (*Id.* at 111–112).  And Mr. and Ms. Patel received dozens of transfers totaling $27,750.24 in Net Winnings on a $100,000 debenture between September 2016 and August 2019.  (*Id.* at 119–120).

### i.  Defendants' Third Affirmative Defense fails as a matter of law because assets were transferred to them within the meaning of "asset" under FUFTA.

Defendants argue in their Response and in their Third Affirmative Defense that these transfers were not true conveyances under the meaning of FUFTA because no "assets" were ever transferred to them.  (Doc. 355 at ¶ 13; Doc. 418 at ¶ 13; *see* Doc. 424 at 3–5).  Specifically, Defendants assert "the only transaction that occurred by and between any of the entities[ ]that is in receivership was a 'Debenture[.]'  None of [t]he Responding parties[ ]transferred or received an asset as part of the transaction."  (*See* Doc. 424 at 2).  The Court is unpersuaded by this argument, however.

 For a transaction to be considered a fraudulent transfer under FUFTA, the property being transferred must qualify as an asset under statutory definitions.  *2-*

*Bal Bay Properties, LLC v. Asset Mgmt. Holdings, LLC,* 291 So. 3d 617, 620 (Fla.

2nd DCA 2020).  "Asset" is defined as "property of a debtor."  Fla. Stat. § 726.102(2).

But "assets" do not include: "(a) Property to the extent it is encumbered by a valid

lien; (b) Property to the extent it is generally exempt under nonbankruptcy law; or

(c) An interest in property held in tenancy by the entireties to the extent it is not

subject to process by a creditor holding a claim against only one tenant."  *Id.* §

726.102(2)(a)–(c).

Defendants have not argued that any of the three exemptions to "asset" apply

here, and upon careful review of these exemptions, the Court finds that they do not

apply.  Instead, the undisputed record evidence indicates that Defendants received

false profits in various amounts, labeled as interest payments, from the debtors.

(*See* Doc. 416-1 at 95–96; 103–04; 111–112; 119–120).  In determining whether

these false profits constitute assets, *Lee* is instructive.  *See* 753 F.3d at 1203.  There,

the defendants argued that the debtors' "transfers of funds from the receivership

entities could not have been transfers of 'assets' because assets under FUFTA must

be 'property of a debtor,' and the funds [the debtor] transferred were property of the

corporations."  *Id.*  The Eleventh Circuit was unpersuaded by this argument,

however, and explained that the funds that the debtor transferred to investors were

funds that he could have used to pay the debts he owed as a result of the Ponzi

scheme.  *Id.* at 1203.  That is, the funds that the debtor transferred to the investors

were the same funds as the investors' initial investment with the debtor, which the

debtor, promising a return on investment, had invested in the corporations.  *Id.*  As the Eleventh Circuit explained,

> [w]ith each transfer that [the debtor] made, [the debtor] became a debtor of the receivership entities because he diverted the funds from their lawful purpose in violation of his fiduciary duties and was thus obligated to return those same funds to the entities to be used for the benefit of the investors.   Therefore, with each transfer, [the debtor] diverted property that he controlled and that could have been applicable to the debt due, namely, the very funds being transferred.

*Id.* at 1203.

The same rationale applies here.  The debtors could have returned the interest payments generated by Defendants' principal investments to the entities to be used for the benefit of other non-winning investors, but they did not.  Thus, the money transferred to Defendants is not only "applicable to the payment of the debt due," but is in fact the actual money that—in part—generated and deepened the debt owed by the debtor to the entities now in receivership.  *See id.*  Accordingly, Defendants' third affirmative defense fails as a matter of law, and the undisputed facts show that the debtors' transfers to Defendants were "assets" that satisfy the third element of a claim of actual fraud under FUFTA: "(3) a conveyance of property which could have been applicable to the payment of the debt due."  *Lee*, 753 F.3d at 1203.

Because each of the aforementioned "interest payment" transfers ("False Profit Distributions") to Defendants were made in furtherance of the Ponzi scheme insofar as here, as in *Lee*, "the investors who profited . . . did not receive income

from their investments, but received principal funds from other investors," the Court finds, as a matter of law, that the receivership entities' distributions to Defendants were fraudulent under FUFTA.  *See Lee*, 753 F.3d at 1201; *see also* Fla. Stat. § 726.105(1)(a).

> ### ii. Defendants' First Affirmative Defense fails because Defendants have not raised a triable issue as to whether they acted in good faith or received the False Profit Distributions for a reasonably equivalent value.

Before granting summary judgment in favor of the Receiver, however, the Court must assess Defendants' first affirmative defense, which applies at this point in the actual fraud analysis.  (*See* Doc. 355 at ¶ 11; Doc. 418 at ¶ 11).  Specifically, Defendants assert that even if actual fraud under FUFTA is shown, the Receiver cannot void the fraudulent transfers under § 726.105(1)(a) because "each Defendant acted in good faith and for a reasonably equivalent value."  (*Id.* (citing Fla. Stat. § 726.109(1) ("A transfer or obligation is not voidable under § 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."))).

### a.  Good Faith

"Because 'good faith' is not defined by statute, courts apply an objective test to determine if a transferee has acted in good faith."  *See In re Berkman*, 517 B.R. 288, 303 (Bankr. M.D. Fla. Sept. 14, 2014).  "[T]he relevant question is whether the transferee had either actual knowledge of the debtor's fraudulent purpose or knowledge of such facts or circumstances that would have caused an ordinarily

prudent person to make further inquiry which, if performed with reasonable diligence, would have disclosed the transferor's fraudulent purpose." *Id.* "[A] transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose." *In re World Vision Entm't Inc.*, 275 B.R. 641, 659 (Bankr. M.D. Fla. Mar. 29, 2002). "Thus, the transferee's lack of actual knowledge of the debtor's fraudulent purpose is relevant to the good faith inquiry, but not dispositive." *Waxenberg*, 611 F. Supp. 2d at 1319.

Here, Defendants have pointed to no evidence in their Response indicating that they acted in good faith. Instead, Defendants' Response makes a convoluted argument about the requirements of the "good faith" defense citing to the California Civil Code, a Ninth Circuit case, a Seventh Circuit case, and a law review article. (*See* Doc. 424 at 8–10). Defendants seem to argue that the Receiver has the burden to prove a lack of good faith, and only after proving a lack of good faith would the Receiver be able to "also recover the amounts that could be considered return of principal."[2] (*Id.* at 8). But this proposed burden shifting is not provided for under Florida law. *See Custer Med. Cntr. v. United Auto Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010) ("An affirmative defense is an assertion of facts or law by the defendant that, if true, would avoid the action and the plaintiff is not bound to prove that the affirmative defense does not exist . . . The defendant has the burden of proving an

---

[2] Specifically, Defendants assert: "Under the constructive fraud theory, the [R]eceiver may only recover 'profits' above the initial outlay, unless the [R]eceiver can prove a lack of good faith, in which case the [R]eceiver may also recover the amounts that could be considered return of principle." (Doc. 424 at 8).

affirmative defense."); *see also Waxenberg*, 611 F. Supp. 2d at 1319 ("Because 'good faith' is an affirmative defense, [defendant] has the burden of demonstrating that she possessed good faith.").  Accordingly, Defendants must "go beyond the pleadings and by their own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Given that the Receiver's responsibility is merely to "point out the absence of evidence supporting the nonmoving party's case," *see Compania de Elaborados de Café v. Cardinal Cap. Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1274 (S.D. Fla. Nov. 4, 2003), it is sufficient that the Receiver merely states, that "the asserted defenses . . . are factually . . . unfounded."  (*See* Doc. 416 at 16).

Here, Defendants have not pointed to any record evidence showing that they lacked actual or constructive knowledge of the debtor's fraudulent purpose, and accordingly, they have failed to show that there is a genuine issue of material fact as to their first affirmative defense.  This alone could be fatal to Defendants' first affirmative defense.  *See Brooks v. Blue Cross & Blue Shield of Florida*, Inc., 116 F.3d 1364, 1370 (11th Cir. 1997) ("If the non-movant . . . fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted.").

However, given that this affirmative defense appears to constitute the bulk of Defendants' Response, the Court is reluctant to obviate the arguments presented by

Defendants without assessing Defendants' claims as to the other element of Defendants' first affirmative defense: "reasonably equivalent value."

### b. Reasonable Value

Once again, the affirmative defense provided by Fla. Stat. § 726.109(1) states that a creditor cannot void a transaction where the defendant "took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." For the reasons below, however, the Court finds that even if there were a genuine dispute of material fact as to the "good faith" portion of the defense, there is no genuine dispute of material fact as to the "reasonably equivalent value" portion of the defense, and thus, Defendants' first affirmative defense fails as a matter of law.

"To determine whether a debtor received reasonably equivalent value in exchange for a transfer, the Court must determine the value of what was transferred and compare it to what was received." *In re Mongelluzzi*, 587 B.R. 392, 404 (Bankr. M.D. Fla. 2018), *on reconsideration in part sub nom. In re Able Body Temp. Servs., Inc.*, No. 8:13-BK-06864-CED, 2018 WL 11206122 (Bankr. M.D. Fla. Sept. 4, 2018).

To this end, the FUFTA provides that:

> [v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Fla. Stat. § 726.104(1).

16

In assessing whether reasonably equivalent value was exchanged, the totality of the circumstances is examined, including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee." *In re Tower Envtl., Inc.*, 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998). "In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal." *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011). "Any transfers over and above the amount of the principal—*i.e.*, for fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee." *Id.*

Here, therefore, the False Profit Distributions received above and beyond Defendants' initial principal investments do not constitute reasonably equivalent value for those initial principal investments. *See Perkins*, 661 F.3d at 627; *see also Wiand v. Cloud*, 919 F. Supp. 2d 1319, 1340 (M.D. Fla. 2013) (granting summary judgment in favor of receiver seeking to claw back false profits under constructive fraud theory and holding, "it is well-settled that a receiver is entitled to recover from winning investors profits above the initial outlay, also known as 'false profits,' and an investor in a scheme does not provide reasonably equivalent value for any amounts received from scheme that exceed the investor's principal investment").

Defendants concede that "[p]ayments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and

thus not fraudulent, because they proportionally reduce the investors' rights to restitution.  If investors receive more than they invested, payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate business activity."  (Doc. 424 at 9–10).

Defendants proceed to make myriad arguments about the applicability of the so-called "netting rule," but provide no indication as to the legal provenance of the "netting rule" as the relevant paragraphs in Defendants' Response contain no citations to case law.  (*See id.* at 9–10).  Instead, Defendants cite a law review article, which provides:

> A final issue that may arise in determining whether reasonably equivalent value . . . has been given is whether payments received by an investor should be credited first against the principal investment, or first against profit which the debtor promised.  One court has stated that any funds which Ponzi investors receive from a debtor should be credited first to principal payments, then to any excess:

> "If a given defendant received less than his undertaking [investment], the amounts received should be considered return of principal, regardless of how the parties may have designated them.  On the other hand, to the extent all transfers to a defendant exceeded his undertaking, the amounts should be considered so-called earnings, regardless of the parties' designation."

Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L. J. 157, 169 (1998) (citing *In re Independent Clearing House Co.*, 77 B.R. 843, 852 n.14 (Bankr. D. Utah July 23, 1987)).  The article continues, "a trustee need only determine whether an investor was a net-winner or net-loser when ascertaining whether the investor received profit; the trustee need

not match-up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers." *Id.*

Here, however, there is no record evidence that any of the Defendants received less than his or her principal investment such that the amounts received from the debtors "should be considered return of principle." *See Independent Clearing House*, 77 B.R. at 852 n.14. Instead, the forensic accounting evidence demonstrates clearly that each of the Defendants received payments in excess of the principal invested. (*See* Doc. 416-1 at 9). For example, Ms. Stallmo invested $285,000 in principal and received $370,208 in payments; Mr. Stallmo invested $70,000 in principal and received $91,583 in payments; Mr. Blitz invested $100,000 in principal and received $128,583 in payments; and Mr. and Ms. Patel invested $100,000 and received $127,750 in payments. (*Id.*)

As is clear from the payment logs, each of the payments received by Defendants came from one of the EquiAlt entities now in receivership. (*See id.* at 95–113, 119–121). And as is clear from the exemplary Form of Debenture in the record, the debtors promised Defendants "the principal sum . . . together with interest on the unpaid Principal Amount thereof computed from the date hereof, at the rates provided herein, on the Maturity Date defined in Section 1 hereof." (Doc. 424 at 15). That is, Defendants were guaranteed—and in fact received—total payments from the debtors in excess of their initial investment.

Thus, while Defendants argue that this case presents a clear example of the netting rule, the Court is unpersuaded. Defendants have introduced no evidence

showing that they received "less than [their] undertaking" such that the amounts that they received "should be considered return of principal, regardless of how the parties may have designated them." *See Independent Clearing House*, 77 B.R. at 852 n.14.  Instead, each of the Defendants received both a return of their principal investment—made in a lump sum at the end of the contract period—as well as payments in excess of their principal investment, which were made both monthly and purportedly represented interest.  (*See* Doc. 424 at 15).  In sum, as the law review article cited to by Defendants notes, "the general rule is that a Ponzi investor cannot retain any of the profits received upon his investments in a Ponzi scheme." *See* McDermott at 169.

Here, the undisputed evidence reflects that Ms. Stallmo received $85,208 in excess of her principal investment, Mr. Stallmo received $21,583 in excess of his principal investment, Mr. Blitz received $28,583 in excess of his principal investment, and Mr. and Ms. Patel received $27,750 in excess of their principal investment.

Accordingly, because the "netting rule" does not apply, and because Defendants have failed to show that they "took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee," *see* Fla. Stat. § 726.109(1), summary judgment is granted in favor of Receiver as to Defendants' First Affirmative Defense.

Because the Receiver has shown that there are no genuine disputes of material fact as to his FUFTA actual fraud claim, nor any genuine disputes of

material fact as to the Defendants' affirmative defenses addressing that claim, the Receiver is entitled to summary judgment as to his FUFTA actual fraud claim. *See* Fed. R. Civ. P. 56(a). The Court finds that the Receiver, "subject to [certain] limitations[,] may obtain . . . [a]voidance of the transfer or obligation to the extent necessary to satisfy [his] claim." *Id.* § 726.108.

### 2. Summary judgment is granted in favor of the Receiver as to his constructive fraud claims.

The constructive fraud provision of FUFTA "allows present creditors to avoid transfers made by a debtor without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Waxenberg*, 611 F. Supp. 2d at 1319 (quotation omitted).

FUFTA's constructive fraud provision states that:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . .
    (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
        1. Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
        2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1)(b). Further, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . and the debtor was insolvent at that time or

the debtor became insolvent as a result of the transfer or obligation."  *See id.* §
726.106(1).

### i. The debtors were insolvent.

"Since Ponzi schemes do not generate profits sufficient to provide their
promised returns, but rather use investor money to pay returns, they are insolvent
and become more insolvent with each investor payment."  *Lee*, 753 F.3d at 1201; *see
In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325, 1327 n.1 (11th Cir. 2002)
("By definition, a Ponzi scheme is driven further into insolvency with each
transaction.").

Here, therefore, because (1) the undisputed forensic accounting evidence
shows that each of the funds operated by the Insiders had revenues that were
insufficient to meet their monthly obligations to investors, (Doc. 416-1 at ¶¶ 28–31),
and (2) the *Davison* court found that "the evidence shows that the [Insiders] most
likely operated as a Ponzi scheme," *see S.E.C. v. Brian Davison, et al.*, Case No.
8:20-cv-325-MSS-MRM,Doc. 184 at 2, the debtors were insolvent at the time of the
various transfers made to Defendants.  Thus, section 726.106(1) is satisfied.

### ii. There was no reasonably equivalent value given by Defendants in exchange for the interest payments they received from the debtors.

As noted in the preceding section, the False Profit Distributions received
"over and above" the Defendants' initial principal investments do not constitute
reasonably equivalent value for those initial principal investments.  *See Perkins*,
661 F.3d at 627 ("Any transfers over and above the amount of the principal—i.e., for

fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee.").  Because there was no reasonably equivalent value given by Defendants in exchange for the False Profit Distributions they received while the Ponzi scheme was operative, there is no genuine issue of material fact that the false profits transferred to Defendants by the debtors were transferred through constructive fraud under Fla. Stat. § 726.105(1)(b).  *See* Fla. Stat. § 726.105(1)(b).  Accordingly, the Receiver is entitled to summary judgment on the constructive fraud claims brought in Count I of his Complaint.

### iii.   Defendants' remaining affirmative defenses fail as a matter of law.

Last, the Court assesses Defendants' remaining affirmative defenses.

### a.  The Second Affirmative Defense fails as a matter of law.

The second affirmative defense states, "under Section 726.109 of The Act, no transfer from any of the above[-]named Defendants is necessary to satisfy the creditor's claim and there is sufficient equity in the assets available to the Plaintiff to satisfy all claimants."  (Doc. 355 at ¶ 12; Doc. 418 at ¶ 12).  The Court presumes that Defendants are referring to Section 726.109(2), which provides, "to the extent a transfer is voidable in an action by a creditor under § 726.108(1)(a), the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less."  *See* Fla. Stat. § 726.109(2).  In sum, the Court understands Defendants to be arguing that the

Receiver cannot void the transactions for the interest payments received by Defendants because the Receiver will be able to recover the amount necessary to satisfy his claim on behalf of all investors, without a deficiency, based on the assets the Receiver has on hand.  (*See* Doc. 424 at 10–12).

In a confusing paragraph applying the above-mentioned "netting rule" to the assets currently under management by the Receiver, Defendants argue "the [R]eceiver has access to over $150 million in cash and assets and is currently generating income of over $1M per month." (Doc. 424 at 10).  Defendants assert that all of the investors—both winners and losers alike—could be paid back their principal investments by the Receiver in which case, the Receiver would have no "clawback" cause of action as to assets—such as false profits—which would exceed the total outstanding debenture principal.  (*Id.* at 10–11).

In support of their argument, Defendants point to the Receiver's Eleventh Quarterly Status Report, which provides the Receiver's cash accounting and states that the ending fund balance at the time of the report is $70,903,869.73.  (*See* Doc. 424 at 27).  The Report also states that the Receiver collects business income from running some of the Insiders' businesses, and that in the period between July 1, 2022 and September 30, 2022, the Receiver had collected $322,317.80 in such income.  (*Id.*)

Notwithstanding Defendants' contentions, the forensic accountants' report reflects that, "[t]he outstanding debenture principal as of the Receivership Date was $169,292,866." (Doc. 416-1 at ¶ 44).  And the Receiver declared in his sworn

24

testimony, "[w]hile the Receivership has collected $78 million, to date, there is no likelihood that the Receivership will collect the $200+ million necessary to pay the outstanding debenture obligations and interest, much less sufficient assets to pay that amount and the ongoing expenses of the Receivership."  (Doc. 416-2 at ¶ 11).

In sum, the record evidence shows that there is insufficient equity in the assets available to the Receiver to satisfy all claimants, as Defendants suggest. Specifically, the evidence highlighted by Defendants does not contradict the Receiver's statements about his collection efforts; it merely indicates that as of the Eleventh Quarterly Report, the Receiver had collected slightly less than half of the outstanding debenture principal as of the receivership date, and roughly a third of the amount needed by the Receivership to pay that debenture obligation as well as the ongoing expenses of the Receivership.  None of the evidence introduced indicates that there is a "likelihood" that sufficient equity will be available based on the Receiver's sworn testimony and the Receiver's Eleventh Quarterly Status Report. Accordingly, summary judgment is granted in favor of the Receiver as to Defendants' Second Affirmative Defense.

### b.  The Fourth Affirmative Defense fails as a matter of law.

Defendants' Fourth Affirmative Defense states that "as provided under Section 726.110[,] [a]ll [c]auses of action are extinguished in that the Plaintiff failed to file" this action in time.  (Doc. 355 at ¶ 14; Doc. 418 at ¶ 14).  Fla. Stat. § 726.110 provides that:

A cause of action with respect to a fraudulent transfer or obligation under §§ 726.101-726.112 is extinguished unless action is brought:

> (1) Under § 726.105(1)(a), within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant;
> (2) Under § 726.105(1)(b) or § 726.106(1), within 4 years after the transfer was made or the obligation was incurred; or
> (3) Under § 726.106(2), within 1 year after the transfer was made or the obligation was incurred.

Here, the Receiver was appointed on February 14, 2020.  *See S.E.C. v. Brian Davison, et al.*, Case No. 8:20-cv-325-MSS-MRM, Doc. 11.  The Receiver filed the Complaint in this action on February 13, 2021.  (*See* Doc. 1).  That Complaint contains causes of action brought under Fla. Stat. §§ 726.105(1)(a), 726.105(1)(b), and 726.105(1)(c).  (*See id.* at ¶¶ 202–204).  Thus, only Fla. Stat. §§ 726.110(1) and 726.110(2) are applicable here.  Under Florida law, the Receiver had one year "after the transfer[s] w[ere] or reasonably could have been discovered" to file his claims against Defendants pursuant to § 726.105(1)(a).  *See* Fla. Stat. § 726.110(1).  Thus, here, indisputably, the Receiver timely brought these claims.  *See* Fla. Stat. § 726.110(1); *see also Cloud*, 919 F. Supp. 2d at 1339 (finding FUFTA claim brought within one year of receiver's appointment to be timely).

Furthermore, to the extent the four-year statute of limitations contained in §§ 726.110(1) and 726.110(2) applies, Defendants all received payments from the debtors returning their principal investments to them and creating the false profits giving rise to this clawback action between February 13, 2017 and February 13,

26

2021, the date this case was filed.  (*See* Doc. 416-1 at 95–96; 103–04; 111–12; 119–20).  In sum, Defendants' Fourth Affirmative Defense fails as a matter of law.

Because there is no genuine dispute of material fact as to the Receiver's actual fraud and constructive fraud claims brought under FUFTA, and because none of Defendants' four affirmative defenses create triable issues, the Court grants summary judgment in favor of the Receiver as to Count I in the Receiver's Complaint.  The Receiver is entitled to avoid and recover the transfers made to Defendants which were fraudulent under Fla. Stat. §§726.105(1)(a), 726.105(1)(b), and 726.105(1)(c).

Because Count II in the Receiver's Complaint is brought as an "alternative" to Count I, the Court need not assess the Receiver's arguments in favor of summary judgment as to that Count.

## CONCLUSION

For the foregoing reasons, Receiver's Motion for Summary Judgment (Doc. 416) is **GRANTED**.  The Court enters judgment against each Defendant avoiding transfers from the EquiAlt Entities in the amount of each Defendant's false profits, together with interest and costs.

On or before August 18, 2023, the Receiver is **DIRECTED** to file a Notice on the docket indicating which Defendants, if any, remain in this case and recommending how this case should proceed.  If the Receiver seeks to renew his Motion for Default Judgment against any remaining Defendants, he must do so on or before August 22, 2023.

The Clerk of Court is **DIRECTED** to enter judgment against Scott Stallmo, Dawn Stallmo, David Blitz, and Sudhaker and Jyotihka Patel.

**ORDERED** at Tampa, Florida on August 15, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE